Harvey **SIEGEL** and Elaine Siegel, husband and wife, et al., Plaintiffs-Appellees,

v.

**CHICKEN DELIGHT, INC.**, et al., Defendants-Appellants.

**CHICKEN DELIGHT, INC.**, et al., Appellants-Petitioners,

v.

George B. **HARRIS**, District Judge, Respondent,

Harvey and Elaine **SIEGEL** et al., Real Parties in Interest.

Nos. 25908, 26860.

United States Court of Appeals, Ninth Circuit.

Sept. 9, 1971.

M. Laurence Popfsky (argued), Richard L. Goff, Stephen V. Bomse, of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants-appellants.

Michael N. Khourie (argued), of Broad, Busterud & Khourie, San Francisco, Cal., Royce H. Schulz, New York City, Cherrin & Cherrin, Southfield, Mich., for plaintiffs-appellees.

Before MADDEN, Judge of the United States Court of Claims, and MERRILL and HUFSTEDLER, Circuit Judges.

MERRILL, Circuit Judge:

This antitrust suit is a class action in which certain franchisees of Chicken Delight seek treble damages for injuries allegedly resulting from illegal restraints imposed by Chicken Delight's standard form franchise agreements. The restraints in question are Chicken Delight's contractual requirements that franchisees purchase certain essential cooking equipment, dry-mix food items, and trade-mark bearing packaging exclusively from Chicken Delight as a condition of obtaining a Chicken Delight trade-mark license. These requirements are asserted to constitute a tying arrangement, unlawful per se under § 1 of the Sherman Act, 15 U.S.C. § 1.

After five weeks of trial to a jury in the District Court, plaintiffs moved for a directed verdict, requesting the court to rule upon four propositions of law: (1) That the contractual requirements constituted a tying arrangement as a matter of law; (2) that the alleged tying products—the Chicken Delight name, symbols, and system of operation—possessed sufficient economic power to condemn the tying arrangement as a matter of law; (3) that the tying arrangement had not, as a matter of law, been justified; and (4) that, as a matter of law, plaintiffs as a class had been injured by the arrangement.

The court ruled in favor of plaintiffs on all issues except part of the justification defense, which it submitted to the jury. On the questions submitted to it, the jury rendered special verdicts in favor of plaintiffs. The opinion of the District Court and the special verdicts appear at 311 F.Supp. 847 et seq. Pursuant to an order of April 27, 1970, Chicken Delight has taken this interlocutory appeal from the trial court rulings and verdicts.

I. FACTUAL BACKGROUND

Over its eighteen years existence, Chicken Delight has licensed several hundred franchisees to operate home delivery and pick-up food stores. It charged its franchisees no franchise fees or royalties. Instead, in exchange for the license granting the franchisees the right to assume its identity and adopt its business methods and to prepare and market certain food products under its trade-mark, Chicken Delight required its franchisees to purchase a specified number of cookers and fryers and to purchase certain packaging supplies and mixes exclusively from Chicken Delight.[1]

1. From the organization's beginning in 1952 until 1959, the franchises were required to purchase, in addition to the cookers and fryers, the batter mix and two types of packaging. Additional packaging items were added in 1959 and in 1961; and in 1963, the beginning of the period in question in this suit, barbecue

The prices fixed for these purchases were higher than, and included a percentage markup which exceeded that of, comparable products sold by competing suppliers.

## II. THE EXISTENCE OF AN UN-LAWFUL TYING ARRANGE-MENT

■ In order to establish that there exists an unlawful tying arrangement plaintiffs must demonstrate *First,* that the scheme in question involves two distinct items and provides that one (the tying product) may not be obtained unless the other (the tied product) is also purchased. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 613–614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). *Second,* that the tying product possesses sufficient economic power appreciably to restrain competition in the tied product market. Northern Pacific R. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). *Third,* that a "not insubstantial" amount of commerce is affected by the arrangement. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Chicken Delight concedes that the third requirement has been satisfied. It disputes the existence of the first two. Further it asserts that, even if plaintiffs should prevail with respect to the first two requirements, there is a *fourth* issue: whether there exists a special justification for the particular tying arrangement in question. United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

### A. *Two Products*

The District Court ruled that the license to use the Chicken Delight name, trade-mark, and method of operations was "a tying item in the traditional sense," 311 F.Supp. at 849, the tied items being the cookers and fryers, packaging products, and mixes.

The court's decision to regard the trade-mark or franchise license as a distinct tying item is not without precedent. In Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), all three judges regarded as a tying product the trade-mark license to ice cream outlet franchisees, who were required to purchase ice cream, toppings and other supplies from the franchisor. *See also* Baker v. Simmons Co., 307 F.2d 458, 466–469 (1st Cir. 1962). Nevertheless, Chicken Delight argues that the District Court's conclusion conflicts with the purposes behind the strict rules governing the use of tying arrangements.

■ The hallmark of a tie-in is that it denies competitors free access to the tied product market, not because the party imposing the arrangement has a superior product in that market, but because of the power or leverage exerted by the tying product. Northern Pac. R. Co. v. United States, *supra.* Rules governing tying arrangements are designed to strike, not at the mere coupling of physically separable objects, but rather at the use of a dominant desired product to compel the purchase of a second, distinct commodity. Times-Picayune Publishing Co. v. United States, *supra,* 345 U.S. at 614, 73 S.Ct. 872, 97 L.Ed. 1277. In effect, the forced purchase of the second, tied product is a price exacted for the purchase of the dominant, tying product. By shutting competitors out of the tied product market, tying arrangements serve hardly any purpose other than the suppression of competition. Standard Oil Co. v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

■ Chicken Delight urges us to hold that its trade-mark and franchise licenses are not items separate and distinct from the packaging, mixes, and equip-

rib seasoning mix which had previously been specified to and made by the franchisees became a required item. More

packaging items were added in 1963 and 1964.

ment, which it says are essential components of the franchise system.[2] To treat the combined sale of all these items as a tie-in for antitrust purposes, Chicken Delight maintains, would be like applying the antitrust rules to the sale of a car with its tires or a left shoe with the right. Therefore, concludes Chicken Delight, the lawfulness of the arrangement should not be measured by the rules governing tie-ins. We disagree.

■ In determining whether an aggregation of separable items should be regarded as one or more items for tie-in purposes in the normal cases of sales of products the courts must look to the function of the aggregation.[3] Consideration is given to such questions as whether the amalgamation of products resulted in cost savings apart from those reductions in sales expenses and the like normally attendant upon any tie-in, and whether the items are normally sold or used as a unit with fixed proportions.[4]

Where one of the products sold as part of an aggregation is a trade-mark or franchise license, new questions are injected. In determining whether the license and the remaining ("tied") items in the aggregation are to be regarded as distinct items which can be traded in distinct markets consideration must be given to the function of trade-marks.

The historical conception of a trade-mark as a strict emblem of source of the product to which it attaches has largely been abandoned. The burgeoning business of franchising has made trade-mark licensing a widespread commercial practice and has resulted in the development of a new rationale for trade-marks as representations of product quality.[5] This is particularly true in the case of a franchise system set up not to distribute the trade-marked goods of the franchisor, but, as here, to conduct a certain business under a common trade-mark or trade name.[6] Under such a type of

2. Appellant, in urging us not to distinguish between the trade-mark and the product it represents, relies in part upon Supreme Court language to the effect that there is no property in a trade-mark except as a right appurtenant to an established business in connection with which the mark is employed. United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918). But the Court did not mean that a mark and the product or business which it identifies are one and the same; it meant simply that, unlike a copyright or a patent, a trade-mark does not confer upon its owner the right to prohibit a competitor's use of the mark unless the owner himself uses the mark in connection with an existing business.

3. See generally, McCarthy, "Trademark Franchising and Antitrust: The Trouble with Tie-Ins," 58 Calif.L.Rev. 1085, 1108 (1970); Turner, "The Validity of Tying Arrangements Under the Antitrust Laws," 72 Harv.L.Rev. 50, 67–72 (1958); cf., Fortner Enterprises Inc. v. United States Steel Corp., 394 U.S. 495, 506–509, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

4. It should be readily apparent that, measured against these tests, the package sales here in question are quite different from the sale of an automobile and its tires or a left shoe and the right. In particular,

there are several factors in this case which other courts have deemed sufficient to find a tie-in. Undisputed testimony at trial established that other franchisors in fast food businesses similar to that of Chicken Delight sold their licenses separate from the essential supplies. The various supplies sold here were sold individually and in differing amounts, rather than in a preassembled package, and the franchisees were billed accordingly. At no time were the franchises required to purchase all their various supplies from Chicken Delight. Chicken Delight did not itself manufacture the tied items. See Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 764 (6th Cir. 1965); United States v. Jerrold Electronics Corp., supra, 187 F.Supp. at 559.

5. See generally, McCarthy, supra, note 3 at 1112–13; Note, "Quality Control and the Antitrust Laws in Trade-mark Licensing," 72 Yale L.J. 1171 (1963).

6. See generally, Baker, "Another Look at Franchise Tie-ins after Texaco and Fortner," 14 Antitrust Bull. 767 (1969); FTC, "Report of Ad Hoc Committee on Franchising," 18–25 (June 2, 1969); Le Blanc, "Antitrust Ramifications of Trade-mark Licensing and Franchising," 53 Trademark Rep. 519, 537 (1963).

franchise, the trade-mark simply reflects the goodwill and quality standards of the enterprise which it identifies. As long as the system of operation of the franchisees lives up to those quality standards and remains as represented by the mark so that the public is not misled, neither the protection afforded the trade-mark by law nor the value of the trade-mark to the licensee depends upon the source of the components.

This being so, it is apparent that the goodwill of the Chicken Delight trade-mark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product. It is not what is used, but how it is used and what results that have given the system and its end product their entitlement to trade-mark protection. It is to the system and the end product that the public looks with the confidence that established goodwill has created.

■ Thus, sale of a franchise license, with the attendant rights to operate a business in the prescribed manner and to benefit from the goodwill of the trade name, in no way requires the forced sale by the franchisor of some or all of the component articles. Just as the quality of a copyrighted creation cannot by a tie-in be appropriated by a creation to which the copyright does not relate, United States v. Paramount Pictures, Inc., 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), so here attempts by tie-in to extend the trade-mark protection to common articles (which the public does not and has no reason to connect with the trade-mark) simply because they are said to be essential to production of that which is the subject of the trade-mark, cannot escape antitrust scrutiny.

■ Chicken Delight's assertions that only a few essential items were involved in the arrangement does not give us cause to reach a different conclusion. The relevant question is not whether the items are essential to the franchise, but whether it is essential to the franchise

that the items be purchased from Chicken Delight. This raises not the issue of whether there is a tie-in but rather the issue of whether the tie-in is justifiable, a subject to be discussed below.

We conclude that the District Court was not in error in ruling as matter of law that the arrangement involved distinct tying and tied products.

### B. *Economic Power*

■ Under the per se theory of illegality, plaintiffs are required to establish not only the existence of a tying arrangement but also that the tying product possesses sufficient economic power to appreciably restrain free competition in the tied product markets. Northern Pacific R. Co. v. United States, *supra*.

Chicken Delight points out that while it was an early pioneer in the fast food franchising field, the record establishes that there has recently been a dramatic expansion in this area, with the advent of numerous firms, including many chicken franchising systems, all competing vigorously with each other. Under the circumstances, it contends that the existence of the requisite market dominance remained a jury question.

The District Court ruled, however, that Chicken Delight's unique registered trade-mark, in combination with its demonstrated power to impose a tie-in, established as matter of law the existence of sufficient market power to bring the case within the Sherman Act.

We agree. In Fortner Enterprises, Inc. v. United States Steel Corp., 394 U. S. 495, 502–503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969), it is stated:

"The standard of 'sufficient economic power' does not, as the District Court held, require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only

with respect to some of the buyers in the market."

Later, at page 504, 89 S.Ct. at page 1259, it is stated:

"Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market."

In United States v. Loew's, Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962), it is stated:

"Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes."

■ It can hardly be denied that the Chicken Delight trade-mark is distinctive; that it possesses goodwill and public acceptance unique to it and not enjoyed by other fast food chains.

■ It is now clear that sufficient economic power is to be presumed where the tying product is patented or copyrighted. United States v. Loew's, Inc., supra; United States v. Paramount Pictures, Inc., supra; International Salt Co. v. United States, supra.

In Fortner, supra, 394 U.S. at page 505, note 2, 89 S.Ct. at page 1259, it is stated:

"Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves. Such barriers may be legal, as in the case of patented and copyrighted products, e.g., International Salt; Lowe's, or physical, as when the product is land, e. g., Northern Pacific."

Just as the patent or copyright forecloses competitors from offering the distinctive product on the market, so the registered trade-mark presents a legal barrier against competition. It is not the nature of the public interest that has caused the legal barrier to be erected that is the basis for the presumption, but the fact that such a barrier does exist. Accordingly we see no reason why the presumption that exists in the case of the patent and copyright does not equally apply to the trade-mark.[7]

Thus we conclude that the District Court did not err in ruling as matter of law that the tying product—the license to use the Chicken Delight trade-mark —possessed sufficient market power to bring the case within the Sherman Act.

C. *Justification*

Chicken Delight maintains that, even if its contractual arrangements are held to constitute a tying arrangement, it was not an unreasonable restraint under the Sherman Act. Three different bases for justification are urged.

■ First, Chicken Delight contends that the arrangement was a reasonable device for measuring and collecting revenue. There is no authority for justifying a tying arrangement on this ground. Unquestionably, there exist feasible alternative methods of compensation for the franchise licenses, including royalties based on sales volume or fees computed per unit of time, which would neither involve tie-ins nor have undesirable anticompetitive consequences.[8]

■ Second, Chicken Delight advances as justification the fact that when it first entered the fast food field in 1952 it was a new business and was

7. Our conclusion conflicts with that of the majority of the *Susser* case, *supra*, 332 F.2d at 518–521, which, after a careful review of the facts in that case, held that sufficient economic power had not been demonstrated. But the *Susser* court understood the economic power test to require a showing of "market dominance." We think that interpretation has since been rejected by the Supreme Court in Fortner Enterprises, Inc. v. United States Steel, Corp., *supra*.

8. It bears noting that Chicken Delight's competitors in the fast food franchising business did not find it necessary to use tie-ins.

then entitled to the protection afforded by United States v. Jerrold Electronics Corp., *supra*, 187 F.Supp. 545. As to the period here involved—1963 to 1970—it contends that transition to a different arrangement would be difficult if not economically impossible.

We find no merit in this contention. Whatever claim Chicken Delight might have had to a new business defense in 1952—a question we need not decide—the defense cannot apply to the 1963–70 period. To accept Chicken Delight's argument would convert the new business justification into a perpetual license to operate in restraint of trade. *See* Id., 187 F.Supp. at 558, 561.

The third justification Chicken Delight offers is the "marketing identity" purpose, the franchisor's preservation of the distinctiveness, uniformity and quality of its product.

 In the case of a trade-mark this purpose cannot be lightly dismissed. Not only protection of the franchisor's goodwill is involved. The licensor owes an affirmative duty to the public to assure that in the hands of his licensee the trade-mark continues to represent that which it purports to represent. For a licensor, through relaxation of quality control, to permit inferior products to be presented to the public under his licensed mark might well constitute a misuse of the mark. 15 U.S.C. §§ 1055, 1127; *See* Note, "Quality Control and the Antitrust Laws in Trade-mark Licensing," *supra*.

 However, to recognize that such a duty exists is not to say that every means of meeting it is justified. Restraint of trade can be justified only in the absence of less restrictive alternatives. In cases such as this, where the alternative of specification is available,[9] the language used in Standard Oil Co. v. United States, *supra*, 337 U.S. at 306, 69

S.Ct. at 1058, 93 L.Ed. 1371, in our view states the proper test, applicable in the case of trade-marks as well as in other cases:

" * * * the protection of the good will of the manufacturer of the tying device—fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. * * * The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied." *Accord*, International Business Machines Corp. v. United States, 298 U.S. 131, 138–140, 56 S.Ct. 701, 80 L.Ed. 1085 (1936).

The District Court found factual issues to exist as to whether effective quality control could be achieved by specification in the case of the cooking machinery and the dip and spice mixes. These questions were given to the jury under instructions; and the jury, in response to special interrogatories, found against Chicken Delight.[10]

 As to the paper packaging, the court ruled as matter of law that no justification existed. It stated, 311 F. Supp. at page 851:

"Defendants' showing on paper packaging is nothing more than a recitation of the need for distinctive packaging to be used uniformly by all franchisees in identifying the hot foods. This was not contested. However, the admissions in evidence clearly demonstrate that the tied packaging was easily specifiable. In fact, the only specifications required were printing and color. Moreover, defendants have admitted that any competent manufacturer of like products could consistently and satisfactorily

---

9. There may, of course, be cases where some extraordinary condition forecloses specification, *e. g.*, where it would divulge a trade secret.

10. Chicken Delight asserts error in the instructions given. In our view, however, the essential question—whether specification under the circumstances was practicable—was properly presented to the jury.

manufacture the packaging products if defendants furnished specifications. Those suppliers could have sold to the franchisees through normal channels of distribution."

We agree. One cannot immunize a tie-in from the antitrust laws by simply stamping a trade-mark symbol on the tied product—at least where the tied product is not itself the product represented by the mark.

We conclude that the District Court was not in error in holding as matter of law (and upon the limited jury verdict) that Chicken Delight's contractual requirements constituted a tying arrangement in violation of § 1 of the Sherman Act. Upon this aspect of the case, judgment is affirmed.

## III. THE MEASURE OF DAMAGES

Section 4 of the Clayton Act, 15 U.S. C. § 15, provides that anyone "injured in his business or property" by reason of a violation of the antitrust laws "shall recover threefold the damages by him sustained." In determining what damages plaintiffs incurred, the District Court noted that the contracts and all written representations by Chicken Delight stated that there were no franchise fees or royalty payments and from that fact concluded that the entire price paid by the franchisees was allocable to the tied items. Thus, the court ruled that the fact of damages equal in amount to the overcharge on the tied items (the amount by which the contract price exceeded the market price for comparable items) was established as a matter of law.

It stated, 311 F.Supp. at page 852:

"On the issue of fact of damage, this Court has determined as a matter of law that the fact of damage is established. Defense counsel persists in his argument that the upcharge in the tied products should be offset by a 'reasonable value' assessed for the

Chicken Delight license. * * * This Court will not attempt to restructure the system of defendants into one which is legally constituted and then allow an offset for imaginary or suppositious royalty fees. Such would be directly contrary to the avowed policy of the Sherman Act."

In this we feel the court erred.

It is by no means clear that any of the parties to the tying arrangements understood that the tying items were to be given free of charge. Indeed, the more reasonable reading of the contracts and of Chicken Delight's representations is that they stated simply that the contract prices for the tied items were to be the full compensation asked by Chicken Delight for both those items and the franchise licenses.

By its own terms, Clayton Act recovery is available only where actual injury has been suffered. Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 (9th Cir. 1965). The question here is whether the plaintiffs have suffered injury by virtue of the unlawful arrangement to which they were subjected. That arrangement of necessity involved both tying and tied products. To ascertain whether an unlawful arrangement for the sale of products has caused injury to the purchaser, the cost or value of the products involved, free from the unlawful arrangement, must first be ascertained. Cf., Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 140, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

Appellants contend that since the value of the tying items must be taken into account, as matter of law appellees have suffered no injury. They reason that the value of the tying items has been conclusively evidenced by what the franchisees were willing to pay (in overcharges for the tied items) in order to get them.

We cannot agree.[11] The franchisees' apparent willingness to pay the

---

11. Were appellant's position correct, there could never be treble damage recovery by tie-in purchasers, since damage could never be demonstrated. This broad principle

ultimate cost of the arrangement is clouded by the fact that they may well have been unaware of what that cost would come to in practice. Had the full amount of the over-charge on the tied items been openly specified as the cost of the tying items, agreement might not have been forthcoming. We can hardly rule as matter of law that it would have been.

■ We conclude that neither the existence of damage nor its lack of existence has been established as matter of law; that factual issues remain as to the value of both tying and tied products, free from the tying arrangement; that remand for the resolution of these issues is necessary.

Upon the issue of damages, judgment is reversed and the case remanded for limited new trial.

## IV. THE PETITION FOR MANDAMUS

Chicken Delight moved in the District Court for a partial summary judgment granting a declaration that, in the event its franchise arrangements are found to be unlawful, they are voidable and terminable by Chicken Delight. The court denied both that motion and Chicken Delight's request for an order authorizing an interlocutory appeal of the question. Chicken Delight now petitions this court for a writ of mandamus commanding the District Court to declare the franchise contracts terminable at Chicken Delight's option.

The theory advanced by Chicken Delight is that, if the franchise contracts

has already been rejected by this court, which has recognized the right of purchasers under illegal tying arrangements to collect treble damages for over-charges.

are unlawful and thus not enforceable against the franchisees, there would be a failure of mutuality and consideration which should preclude enforcement by the franchisees. In more practical terms, Chicken Delight's concern is that the District Court's decision might entitle the plaintiffs to a royalty-free franchise license in the future.

■ Mandamus is an extraordinary remedy, the issuance of which is discretionary. *See, e. g.,* Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); Whitehouse v. Ill. Cent. R. Co., 349 U.S. 366, 373, 75 S.Ct. 845, 99 L.Ed. 1155 (1955). Without reaching the question of whether the illegal franchise arrangements should be terminable at Chicken Delight's option, we decline to issue the writ at this time.

■ Both the appeal and the petition are interlocutory. The issues involved may become more clear after the case is completely settled in the District Court. (It may even be that Chicken Delight will not desire review of the District Court's disposition at that point.) Since the District Court's theory of damages and its refusal to allocate any of the purchase price to the tying product has been reversed, the factual background of the issue raised in the petition is already quite different from that anticipated when the petition was filed. Chicken Delight's interests can be adequately protected by an appeal at the end of the District Court proceedings.

Writ denied.

No costs are awarded.

*See* Lessig v. Tidewater Oil Co., 327 F.2d 459, 471–472 (9th Cir. 1964) ; *see also* Osborn v. Sinclair Refining Company, 324 F.2d 566, 570 (4th Cir. 1963).