Robert ANDERSON et al.

v.

HOME STYLE STORES, INC., et al.

Civ. A. No. 71–201.

United States District Court,
E. D. Pennsylvania.

Sept. 3, 1974.

Michael H. Malin, Philadelphia, Pa., for plaintiffs.

George P. O'Connell, Rockledge, Pa., for defendants.

## MEMORANDUM

NEWCOMER, District Judge.

Plaintiffs, one present and two former delicatessen operators, brought suit in January, 1971 against the defendants named above for alleged violations of the antitrust laws. Plaintiffs alleged that defendants violated Section 1 of the Sherman Act [1] by tying the purchase of defendants' goods to the extension of credit by defendants to plaintiffs. Plaintiffs also claimed that defendants attempted to monopolize the market for delicatessen goods, a violation of Section 2 of the Sherman Act [2], and that the tying arrangements attacked under Section 1 constituted a violation of Section 3 of the Clayton Act [3].

This Court denied plaintiffs' first motion for summary judgment in December, 1972. 58 F.R.D. 125 (1972). However, in April, 1973, upon a renewed motion for summary judgment by the plaintiffs, this court granted summary judgment on the issue of liability as to two of the three plaintiffs. 358 F.Supp. 253 (1973). This order was in turn vacated by the Court on March 29, 1974, 373 F.Supp. 1035, and the case was set for trial on the issue of liability and damages as to all three plaintiffs. Upon the completion of the plaintiffs' case at trial the Court directed a verdict in favor of defendants under Rule 50(a). This memorandum is submitted in the hopes of explaining the ultimate resting place of this singular chain of decisions.

Plaintiffs claimed that it was defendants' practice to install individuals as delicatessen operators either by granting

---

1. 15 U.S.C., § 1 (1890)

2. 15 U.S.C., § 2 (1890)

3. 15 U.S.C., § 14 (1914)

or guaranteeing start-up loans to them in exchange for an agreement by those individuals to purchase all their delicatessen supplies from defendant Home Style Provisions, Inc.[4] Plaintiffs claim that they and numerous other individuals were compelled by reason of defendants' power over the credit market (in the form of defendants' ability to extend credit or to guarantee plaintiffs' promissory notes to the sellers of the stores) to purchase all their supplies from defendants at excessive prices. The conditioning of this credit upon the acceptance of the requirements contracts, plaintiffs alleged, was the kind of tying arrangement which was *per se* illegal under Section 1 of the Sherman Act.

Defendants did not, in most cases, extend credit directly to the plaintiffs, but, as testified to at trial, arranged the terms of plaintiffs' purchase of their delicatessen stores, and, either by guaranteeing plaintiffs' promissory notes to the sellers or by accepting assignment of those notes from the sellers, provided the security that was necessary to enable plaintiffs to enter into business. In the case of plaintiff Anderson, the purchase of the delicatessen was made directly from defendant Home Style in a transaction where Anderson borrowed the down payment of $3,000 from a commercial bank and delivered Home Style a promissory note in the amount of $15,000. In the cases of plaintiffs Lang and Worthington, the promissory notes

of $15,000 and $11,000, respectively, were given to the delicatessens' former owners, who assigned the notes on a recourse basis to Home Style. Home Style then took the notes to a bank and discounted them.[5]

The principal case upon which both plaintiffs and defendant relied in support of their respective positions was Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Plaintiffs relied heavily upon *Fortner's* finding that credit can be a tying product under the antitrust laws and defendants' placed their defense primarily upon *Fortner's* definition of market power in the tying product. In *Fortner* the Supreme Court reversed the entry of summary judgment in favor of United States Steel where it was alleged that one of that company's sub-divisions, the Homes Credit Corporation, loaned money to plaintiff on uniquely favorable terms on the condition that plaintiff, a residential developer, bought prefabricated homes from defendant. In finding that such a complaint stated a cause of action for which relief could be granted, the Court set forth the elements necessary to make out a *per se* illegal tying arrangement. The first requirement for *per se* liability is that the defendant possess sufficient economic power over the tying product to inhibit competition in the tied product.[6] In our case, as in *Fortner*, the tying product is credit.

4. It was testified to at trial that defendants Copeland and Giralmo were the directors and operators of Home Style Stores, Inc. and that Home Style Provisions, Inc., unincorporated under Pennsylvania law, was merely a front for these two individual defendants.

5. The rate of interest payable by the plaintiff-buyer on all three of these promissory notes was six (6) percent, calculated on a principal which was reduced by each weekly payment. No evidence was submitted concerning the amount, if any, charged by defendants for their discounting or guaranteeing. Had plaintiffs shown that defendants received little or no compensation for performing these services (except, of course, the requirements contracts), this would have

established the defendants possessed sufficient economic power in the tying product market, since no lending institution would (or could afford to) perform these services gratis. Such evidence would have sustained a jury finding of *per se* liability in this case.

6. In explaining the rationale behind requiring a showing of sufficient economic power, the *Fortner* Court stated:

"These decisions rejecting the need for proof of truly dominant power over the tying product have all been based on a recognition that because tying arrangements generally serve no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of any appreciable restraint on competition provides a sufficient reason for invalidat-

The second requirement is that a not insubstantial amount of commerce in the tied product be affected by the arrangement. The Court pointed out that for the purposes of determining whether the amount of commerce foreclosed was too insubstantial to warrant prohibition of the practice the relevant figure is the total volume of sales tied by the sales policy under challenge, "not the portion of this total accounted for by the particular plaintiff who brings suit." 394 U. S. at 502, 89 S.Ct. at 1258.

The "sufficient economic power" requirement soon became the focus of the present suit. This Court early in the case found that a not insubstantial amount of commerce had been affected by the tying arrangement policy, 58 F. R.D. at 128. Thus the principle question throughout the pre-trial and trial period, and particularly in the arguments at the close of plaintiffs case became: what evidence of economic power over the tying product is sufficient to allow plaintiffs case to go to the jury on the question of liability?

Plaintiffs argue that *Fortner* allows a jury to infer sufficient economic power over the tying product from a number of different kinds of evidence. One such kind of evidence would be the number of buyers who had accepted the tying arrangement, in this case the number of individuals whom defendants had enabled to become delicatessen operators on the condition that they bought all their supplies from defendants. In discussing the quantum of proof which was necessary to show sufficient economic power, the Supreme Court in *Fortner* had stated:

> "Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market". 394 U.S. at 504, 89 S.Ct. at 1259.

Plaintiffs claimed that the number of persons affected by defendants' tying arrangements were appreciable.

Second, plaintiffs contended that *Fortner* permitted a jury to draw an inference of economic power from the fact that plaintiffs or others in plaintiffs' position had been willing to pay a higher than competitive price for the tied product. As the Court stated in *Fortner*:

> "Since in a freely competitive situation buyers would not accept a tying arrangement obligating them to buy a tied product at a price higher than the going market rate, this substantial price differential with respect to the tied product . . . . in itself may suggest that respondents had some special economic power in the credit market." 394 U.S. at 504–505, 89 S.Ct. at 1259.

Third, plaintiffs contended that an inference of economic power can be drawn from the uniqueness or desirability of the tying product, which arose in this case because of plaintiffs' alleged inability to obtain the financing necessary to go into business from any other source except defendants. Plaintiffs claimed at trial that they had presented enough evidence to raise all three of these inferences, and that their case could go to the jury even if the facts necessary to give rise to one or two of the permissible inferences had not been made out. Defendants on the other hand declared that Fortner had established but one test of economic power, the "uniqueness" test. Defendants stated that the uniqueness necessary to make out economic power could not be implied merely from the general unavailability of the product, but must depend upon some legal, physical, or economic inability of defendant's competitors in the tying product market to provide the product on the terms provided by defendant. Defendants based this contention on an opinion of an ap-

---

ing the tie. Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market. . . . " 394 U.S. at 503, 89 S.Ct. at 1258.

pellate court subsequent to the Supreme Court's decision in *Fortner*. Fortner Enterprises, Inc. v. United States Steel Corp., 452 F.2d 1095 (6th Cir. 1971). In *Fortner II* the Sixth Circuit reversed the district court's entry of summary judgment in favor of plaintiff on the issue of sufficient market power. The Court rejected plaintiff's argument that U.S. Steel's ability to impose the tie-in with respect to an appreciable number of buyers within the market satisfied the sufficient economic power test of *per se* illegality. The Court stated:

> "The (Fortner) majority opinion did not hold that the acceptance of the tie-in by customers without more is proof of economic power. If the majority had intended to indicate that acceptance of a tie-in by an appreciable number of customers is sufficient proof of the requisite economic power, it would have been sufficient for Mr. Justice Black to have said so and thus to avoid the exhaustive treatment which he gave to the question of economic power and the tying product set forth in other portions of his opinion." 452 F.2d at 1103.

Contra Advance Business Systems and Supply Company v. SCM Corporation, 415 F.2d 55 (4th Cir. 1969), cert. den. 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

We are not faced with deciding whether *Fortner* allows only one or many ways to prove sufficient economic power. While the existence of an appreciable number of buyers may properly give rise to an inference of market power in other contexts, we believe that such a standard is inapplicable here because the only source of market power claimed by plaintiffs was the unavailability elsewhere of the credit necessary to enable them to enter business. Another word for unavailability is uniqueness. The *Fortner* case made it clear that uniqueness of the terms of the credit or, as in this case, the credit itself is not enough to make out the requisite economic power. The unavailability of credit elsewhere must reflect legal, physical, or economic barriers which prevent defendants' competitors in the credit market from offering such credit. There is no question in this case of any legal or physical inability on the part of other lenders in the credit market to offer loans to plaintiffs in the amounts required to go into business; therefore, the only remaining area in which defendants could have an advantage of their competitors is economic, i. e., where the "competitors are simply unable to produce the distinctive product profitably . . ." 394 U.S. at 505, 89 S.Ct. at 1259. Plaintiffs have utterly failed to show that defendants enjoyed a cost advantage in making their guarantees of plaintiffs' financial arrangements or that defendants' competitors were unable to make equivalent financial arrangements profitably. Plaintiffs produced one expert, a commercial banker, who testified that given plaintiffs' lack of assets and inexperience no commercial bank would have loaned them the necessary funds to go into business. Plaintiffs' expert did not testify that such loans could not be made profitably, but even allowing the inference that they could not, the expert testified, and was only qualified to testify, about one of many lending institutions in the credit market. Plaintiffs' expert admitted on cross-examination that numerous other institutions, such as commercial finance companies, credit unions, trust companies, insurance companies, pension endowment funds, and public development corporations, compete with commercial banks in making the kind of loans plaintiffs required. Plaintiffs' expert conceded that there were a number of such institutions in the geographic area of plaintiffs' stores, but no testimony was offered by plaintiffs as to these institutions' cost or profit structure. Nor was there sufficient evidence of the unavailability of loans from these types of institutions, since plaintiffs testified that they did not attempt to secure loans from outside sources. As we stated in

granting defendants' motion for a directed verdict:

"even recognizing that the existence of an appreciable-number of buyers of the tie-in may give rise to an inference of market power, and assuming that an appreciable number are involved here, the only source of market power here is the uniqueness of the credit, and the plaintiffs have failed to show the necessary legal, physical, or economic foundations of any such uniqueness." [7]

As for plaintiffs' claims under Section 2 of the Sherman Act and Section 3 of the Clayton Act, plaintiffs withdrew their Section 2 claim at the conclusion of their case, (Tr., p. 536), and Section 3 of the Clayton Act does not cover tying arrangements where the tying product is credit. Fortner v. United States Steel Corp., 394 U.S. 495, 521, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (Fortas, J., dissenting).[8]

7. The evidence that was lacking in plaintiffs' case is not the kind of evidence which the Court can supply by taking judicial notice. Scheuer v. Rhodes, 416 U.S. 232, 249–250, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

8. Nor could plaintiffs have gone to the jury on a general unreasonable restraint, or "rule of reason", theory under Sherman Act, § 1, since plaintiffs did not present sufficient evidence of the relevant product market, the relevant geographic market, the effects of the restraint upon competition, or the purposes behind the restraints.